UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Thomas A. Ferris,

Plaintiff,

v.

Bodycote Lindberg Corporation,
a Delaware Corporation

Defendant.

Civil File No. 01-1689 (MJD/JGL)

**MEMORANDUM OPINION AND ORDER**

---

Patrick M. Connor, Esq., and Eric D. Satre, Esq., Connor Satre & Schaff, 10 South Fifth Street, Suite 925, Minneapolis, MN 55402, counsel for Plaintiff.

Thomas E. Marshall, Esq., Jackson Lewis, 150 South Fifth Street, Suite 2800, Minneapolis, MN 55402; Shelley B. Martin, Esq., Tiller Corp., 7200 Hemlock Lane, Suite 200, Maple Grove, MN 55311-6480, counsel for Defendant.

---

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. In the underlying complaint, Plaintiff asserts two causes of action against Bodycote: (1) promissory estoppel; and (2) fraudulent inducement of employment in violation of Minn. Stat. § 181.64. Oral arguments on this matter were heard on March 26, 2003. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment, and Plaintiff's claims are dismissed with prejudice.

## II. BACKGROUND

Plaintiff Thomas A. Ferris ("Ferris") started as a drill press operator with Doppler Gear[1] ("Doppler") in 1995. After a few months he transferred to an open position in shipping and receiving. The position required that Ferris perform a significant amount of heavy lifting, at times lifting boxes weighing up to 100 pounds. Ferris also was required to perform overhead

---

1 Doppler manufactures gears of all types and sizes.

FILED JUN 3 0 2003
RICHARD D. SLETTEN
JUDGMENT ENTD. JUN 3 0 2003
DEPUTY CLERK

lifting and was in charge of driving and maintaining the forklift. While in that position, he met John Winkelman ("Winkelman"), who at that time was a Bodycote Lindberg Corporation ("Bodycote")[2] driver. Winkelman visited Bodycote daily in the course of his job, and Ferris would assist Winkelman in loading and unloading his truck.

In 1997, Ferris had two surgeries for complete tears of his rotator cuffs in both shoulders. He was out of work for approximately nine months. Although he initially felt better following the surgeries, his pain eventually became worse. Starting in December 1998, Ferris began taking opiates and other narcotic painkillers regularly.

At some time in 1999, Ferris was promoted to shipping manager. As shipping manager, Ferris did significantly more office work, but also continued to perform physical aspects of his job, such as lifting and packing boxes to meet orders. Around the same time, Winkelman transferred to the customer service department of Bodycote. Winkelman and Ferris continued to have contact by phone several times a week.

In the spring of 2001, Ferris indicated to Winkelman that he was dissatisfied with his job at Doppler. Coincidentally, Bodycote needed an individual to run its shipping and receiving department. Over a several month period, reciprocal overtures of interest passed back and forth between Winkelman and Ferris. The courtship of Ferris by Winkelman continued, with Ferris having his wife fax his resume to Winkelman. Winkelman asked Ferris what it would take to get him to come over to Bodycote, and Ferris responded that he was willing to consider an offer if it paid more and had better benefits than his position at Doppler. Ferris asserts that he told Winkelman at the beginning of the courtship, "[Y]ou know what my limitations are," referring to his physical limitations. Winkelman allegedly responded, "that's not a problem . . . [y]ou'll be doing exactly the same thing you're doing right now at Doppler."

---

[2] Bodycote receives the gears manufactured by Doppler and hardens them with a "heat treating" process.

Ferris subsequently accompanied Winkelman on a tour of Bodycote's facilities. During this tour Winkelman explained Bodycote's benefits, including medical, dental, and vision. Winkelman and Ferris also discussed pay, and Ferris asked for $15 per hour. Winkelman indicated that Bodycote would be amenable to such a wage. Winkelman showed Ferris what the job would entail. The position required the ability to lift 25 pounds, and often required handling of UPS boxes weighing fifty to seventy pounds. The job also required driving a forklift. Bodycote asserts that Winkelman told Ferris that he would have to pass a physical, but Ferris denies that he was told this.

The Monday following the tour of Bodycote, Winkelman called Ferris at work and allegedly told Ferris that the money was squared away. Ferris asserts that Winkelman told him, "We're offering you a job." Ferris then told his boss at Doppler that he had an offer from Bodycote, but that he would prefer to stay with Doppler if they could come close to matching the offer. Doppler matched Bodycote's salary, but Doppler was unable to match the benefits. As a result, Ferris called Winkelman and told him that he was accepting the job at Bodycote and that he had given his two-week notice to Doppler.[3]

On May 9, 2001, during the second week of Ferris's two-week notice period, Winkelman drove to Doppler and gave Ferris a package of papers, including an employment application for Bodycote and a Conditional Offer of Employment. The Conditional Offer of Employment stated:

> Lindberg Heat Treating Company[4] offers employment to the above applicant subject to the applicant's satisfactory completion of a physical and drug screening. It is understood that this conditional offer of employment may be withdrawn by Lindberg Heat Treating, subject to the applicable State and Federal laws, if the applicant fails to pass either the drug test or the physical examination.

Ferris signed both forms on May 11, 2001.

---

3 Ferris put in his two-week notice on April 27, 2001.

4 Lindberg, an Illinois corporation, was purchased in January 2001 by Bodycote of Manchester, England. Presumably, Bodycote was using a pre-printed offer of employment that pre-dated Bodycote's acquisition.

On May 14, 2001 Ferris saw Dr. Michael Goertz ("Goertz") for his pre-employment physical. Goertz reviewed Ferris's medical records which indicated the 1997 surgeries and the opiate and narcotic painkiller usage. In addition, the records indicated that Ferris was told by his doctor in February 2001 that his permanent restrictions required that he perform no overhead lifting, that he could lift 1 to 9 pounds from his waist to 90-degrees occasionally, and that he could lift 10 pounds from the ground to waist only 30% of the time.

After reviewing Ferris's medical records, Goertz "medically recommended" Ferris with some weight restrictions regarding lifting, but no overhead lifting. Goertz also recommended that Ferris not drive heavy vehicles or operate heavy equipment, which included a forklift. Following receipt of Goertz's recommendation, Winkelman called Ferris and told him that the limitations were not acceptable, and that he had failed the physical. Bodycote rescinded its offer of employment because Ferris could not fulfill the requirements of the position. Ferris subsequently brought this action.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *See Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957. The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *See Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary

judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designated 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### B. Plaintiff's Promissory Estoppel Claim

"Promissory estoppel is an equitable doctrine that 'implies a contract in law where none exists in fact.'" *Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (quoting *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981)). The elements of a promissory estoppel claim are: (1) that a clear and definite promise was made; (2) the promisor intended to induce the promisee to rely on the promise and the promisee did in fact rely to his or her detriment; and (3) the promise must be enforced to prevent injustice. *See id.* (citing *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992)). In order to survive Bodycote's motion for summary judgment, Ferris must direct the Court to some evidence that would support each element.

#### 1. Promise

A promise is an objectively clear and definite assurance that a thing will be done. *See Cederstrand v. Lutheran Bhd.*, 117 N.W.2d 213, 219, 263 Minn. 520, 530 (1962); *Spanier v. TCF Bank Savings*, 495 N.W.2d 18, 20-21 (Minn. Ct. App. 1993). A statement or communication is a clear and definite promise if the promisor should reasonably expect to induce action on the part of the promisee. *See Martens*, 616 N.W.2d at 746.

Ferris asserts that Bodycote, through Winkelman, made a definite promise and unconditional offer of employment at a negotiated specific hourly rate. Specifically, Ferris contends that Winkelman called him on the Monday following the tour of Bodycote's facility and told him, "We're offering you a job." Bodycote asserts that Winkelman's purported statement was not a clear and definite promise of employment and instead characterizes it as a mere overture in an ongoing negotiation. Ferris responds that, in the context of Winkleman's

agreement to his salary demand, such a statement constituted an unconditional offer of employment.

In *Grouse*, the Minnesota Supreme Court found sufficient an offer similar to the alleged offer in this matter. *See* 306 N.W.2d at 115. Like this case, the defendant employer in *Grouse* offered the plaintiff a job by telephone, following an explanation of company procedures and policies as well as salary and benefits. *See id.*; *see also Gorham v. Benson Optical*, 539 N.W.2d 798, 801 (Minn. Ct. App. 1995). It is the Court's conclusion, viewing the record in a light most favorable to Ferris, that Winkelman's alleged statement, "We're offering you a job," is clear and definite enough to satisfy the requirements of this element.

**2. Reliance**

Where evidence exists to indicate the possibility of a clear and definite promise, the reasonableness of a promisee's reliance on that promise is generally a fact question for a jury to decide. *See Brenner v. Nordby*, 306 N.W.2d 126, 127 (Minn. 1981); *Norwest Bank Minnesota, N.A. v. Midwestern Mach. Co.*, 481 N.W.2d 875, 880 (Minn. Ct. App. 1992).

It is undisputed that Ferris quit his job at Doppler to his detriment, as he has not been employed since. Bodycote asserts, however, that it did not intend to induce Ferris to resign prior to meeting the conditions in its offer. Bodycote points out that Ferris called Winkelman *after* he put in his two-week notice at Doppler, to tell him that he was accepting Bodycote's offer and had resigned his job. Ferris responds that Winkelman acknowledged that he had put in his two-week notice and it was not until near Ferris's last day that Winkelman brought over the purported conditional offer. Ferris argues that Bodycote intended that Ferris quit his job at Doppler in reliance on the offer.

The facts in this case differ in a slight, but significant way from both *Grouse* and *Gorham*. In both cases, the defendants had explicit notice at the time of offer that plaintiffs would be resigning their current jobs. *See Grouse*, 306 N.W.2d at 115; *Gorham*, 539 N.W.2d at 799. In fact, in *Grouse*, the defendant called plaintiff to confirm that he had resigned from his

current job, *see* 306 N.W.2d at 115, and in *Gorham*, the defendant called to reassure plaintiff that everything was finalized so he could give his current employer notice, *see* 539 N.W.2d at 799.

In this matter, the record indicates that Ferris and Winkelman had some discussion about a start date, but nothing supports a definite agreement on what it would be. Furthermore, Ferris's actions in attempting to negotiate a better deal with Doppler tend to make it look as though an ongoing series of negotiations were underway when Ferris accepted Bodycote's alleged offer. Neither Winkelman nor Bodycote asked that Ferris resign, and they did not have notice that he had done so or intended to do so until after he already put in his two-week notice.

Based on the record before the Court, Ferris's reliance is less reasonable than that of the plaintiffs in *Grouse* and *Gorham*. Nonetheless, viewing the facts in a light most favorable to Ferris, it is the Court's conclusion that a sufficient fact question exists to preclude summary judgment on this element. Assuming that a reasonable jury found a clear and definite promise, it could also conclude that Bodycote should have reasonably expected that Ferris would rely on that promise to his detriment.

**3. Injustice**

Whether the promise must be enforced to prevent injustice is a legal question for the Court. *See Cohen*, 479 N.W.2d at 391. The essential test under this element is "not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice." *Id.*; *Ruzicka v. Conde Nast Publications, Inc.*, 999 F.2d 1319, 1323 (8th Cir. 1993). The Court must consider the reasonableness of the promisee's reliance and weigh the public policies in favor of enforcing bargains and preventing unjust enrichment. *See Faimon v. Winona State Univ.*, 540 N.W.2d 879, 883 (Minn. Ct. App. 1995); *rev. denied*, Feb. 9, 1996.

Bodycote asserts that Ferris has failed to show any injustice entitling him to equity. Ferris, in response, asserts that the injustice lies in Bodycote's inducement of Ferris to leave a secure job at Doppler, based on the expectation that Bodycote would employ him. Ferris asserts that if he had known that Bodycote required a physical, that he would not have applied because

of his physical limitations. Ferris knew what the physical requirements of the job were and does not seem to dispute that his medical restrictions prevented him from fulfilling all of the job's requirements without breaking the restrictions.

Furthermore, Ferris cannot seriously argue that if he had been hired by Bodycote pursuant to the alleged original offer, that he would have been an at-will employee, and that Bodycote could have fired him for any reason, including that he was unable to fulfill the requirements of the job. *See Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn. 1983). The record in this matter leads only to the conclusion that Ferris quit his employment with Doppler because he believed that Bodycote would employ him in a position that had physical requirements he could not fulfill. Not only would Ferris have been unable to fulfill the requirements, but had he attempted to do so, he would have violated his medical restrictions and placed himself at risk. Even when the record is viewed in the light most favorable to the Plaintiff, there exists no injustice. *Cf.*, *Frey v. Ramsey County Cmty Human Serv.*, 517 N.W.2d 591, 597 (Minn. Ct. App. 1994) (stating that employee who would not have been hired but for lie or fraud, should not profit from such misconduct). As such, Ferris's claim must fail, and Bodycote is entitled to judgment as a matter of law.

**C. Plaintiff's Minn. Stat. § 181.64 Claim**

Under Minnesota Law, it is unlawful for any person or business to induce an individual to change employment by making knowingly false representations about, *inter alia*, "the kind or character of such work, [or] the compensation therefor[.]" Minn. Stat. § 181.64. An individual relying on representations prohibited by section 181.64, is entitled to recover damages sustained as a result of the false representations. *See* Minn. Stat. § 181.65. In order to survive Bodycote's motion for summary judgment, Ferris must produce some evidence that Bodycote, through Winkelman, falsely promised him a job, in order to induce him to leave Doppler. *See, e.g.*, *Coxall v. First Bank Sys., Inc.*, 1993 WL 339062, *1 (Minn. Ct. App. 1993).

Bodycote asserts that it is entitled to summary judgment on Ferris's claim under Minn. Stat. § 181.64, because it made no misrepresentations and it intended to hire Ferris if he passed the physical. Ferris asserts, in response, that Bodycote refused to employ him because he had known medical conditions that might require accommodation and that, in an attempt to avoid employing him, Bodycote falsely claimed that the original offer was conditional and that he did not pass the physical.

The record is devoid of any evidence tending to show that Winkelman or Bodycote made a knowingly false representation about the kind or character of the work at the job or its compensation. Furthermore, Ferris's contention that Bodycote lied about him failing the physical is without merit. It is undisputed that Ferris passed the physical, but with limitations such that he was unqualified for the position at Bodycote. As such, Ferris's argument seems to rest on an irrelevant and disingenuous interpretation of semantics. Ferris's claim under section 181.64 must fail, and Bodycote in entitled to judgment as a matter of law.[5]

## IV. CONCLUSION

While sufficient fact questions exist to preclude summary judgment on the first two elements of Ferris's promissory estoppel claim, the record cannot support a finding of injustice. Additionally, Ferris's claim for fraudulent inducement of employment in violation of Minn. Stat. § 181.64 is unsupported by the record.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED**.
2. Plaintiff's prosmissory estoppel claim is dismissed with prejudice.

---

[5] In his responsive memorandum, Ferris makes reference to the common law elements of fraudulent misrepresentation. To the extent that such a claim is properly before the Court, Bodycote is entitled to summary judgment for the same reasons that it is entitled to summary judgment on Ferris's fraudulent inducement of employment claim.

3. Plaintiff's claim of fraudulent inducement of employment in violation of Minn. Stat. § 181.64 is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 30, 2003

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995